UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT



| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR SEARCH WARRANTS | Case No. 3:24MJ1060 (TOF)<br><br>**Filed Under Seal** |

## SUPPLIMENTAL AFFIDAVIT

I, Corbett Tomsovic, being first duly sworn, hereby depose and state as follows:

### I. INSTANT REQUESTS

1. As discussed herein, on November 8, 2024, the Honorable United States District Judge Omar A. Williams approved search warrants which authorized the search of a car dealership business used by a drug trafficking organization (DTO) as a stash and distribution location, six residences occupied by DTO members and used in connection to criminal conduct, and four stash locations used by DTO members to store narcotics, store narcotics proceeds, and distribute narcotics. Relatedly, on November 13, 2024, the Honorable Thomas O. Farrish, approved warrants for the arrest of twelve individuals associated with the DTO. This Supplemental Affidavit sets forth probable cause to believe, and I do believe, that the Task Force has identified a hotel room in which Nelson ALEJANDRO-CAPO was staying, contains narcotics and/or further evidence of the crimes in which he is accused of committing.

2. I submit this affidavit in support of an application for a search warrant for the following physical location (collectively referred to as the "**Target Location**"), described below and in the respective Attachment A, for evidence as described in the respective Attachment B, incorporated:

1

      a.   The Red Roof Inn, 65 Columbia Blvd, **Room 309**, New Britain Connecticut, (**Target Location-1**), as described in Attachment A, incorporated, believed to be the temporary residence of ALEJANDRO-CAPO and which contains evidence of narcotic felonies, as described in Attachment B, incorporated.

## INTRODUCTION & BACKGROUND

3.    I am a special agent with the Federal Bureau of Investigation (FBI) in New Haven, Connecticut. I have been employed by the FBI since June 2021. I am assigned to the Northern Connecticut Safe Streets Gang Task Force (Task Force). The Task Force includes the FBI, the Waterbury Police Department (WPD), the Connecticut State Police (CSP), The New Britain Police Department (NBPD), the West Hartford Police Department (WHPD), the Hartford Police Department (HPD), the Naugatuck Police Department (NPD), and the Connecticut Department of Correction (DOC). As a Task Force member, I direct the instant investigation of two drug trafficking organizations in Waterbury, Connecticut detailed herein.

4.    I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am also a "federal law enforcement officer" within the meaning of the Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent authorized to enforce criminal laws and duly authorized by the Attorney General to request a search warrant.

5.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Based upon information known to me because of my participation in this investigation, as well as information, which I have determined to be accurate and reliable, provided to me by other law enforcement officers, including

2

my co-case agents in this investigation, I am familiar with the information discussed herein. Where the contents of documents, or communications with others, are reported herein, they are set forth in substance and part, unless otherwise indicated.

6. ALEJANDRO-CAPO has been identified as a conspirator via the use of various investigative methods, including but not limited to, physical surveillance, at times in conjunction with contemporaneous wiretap intercepts, review of records, including telephone service provider records, motor vehicle records, and utility records, voice identification, and the content and context of intercepted communications. Because the information and evidence gathered during this investigation is voluminous, I have not included every fact known to me concerning this investigation. Instead, I have set forth those facts which I believe are necessary to establish the existence of probable cause to support the requested authorizations.

## II.    SUMMARY OF THE INVESTIGATION

7. The FBI Task Force has been investigating a DTO based in New Britain, Connecticut since at least February of 2024. The investigation has revealed that members of the DTO have committed, are committing, and will commit violations of the **Target Offenses**. The DTO is believed to be involved in the distribution of narcotics, principally cocaine and fentanyl.

8. During the course of this investigation the Task Force developed probable cause to arrest various members of the DTO, to include ALEJANDRO-CAPO.

## III.   TRAINING AND EXPERIENCE

9. I was trained as a police officer at the North Central Georgia Law Enforcement Training Academy and as a special agent at the FBI Academy. During my career, I have participated in numerous criminal investigations, including investigations involving suspected narcotics trafficking by individuals and organizations, gang activity, violent crime, and money

3

laundering. My participation in these investigations has included coordinating controlled purchases of narcotics utilizing cooperating sources; coordinating the execution of search and arrest warrants; conducting electronic and physical surveillance; analyzing records related to narcotics trafficking; interviewing and debriefing cooperating sources and witnesses, and discussing strategy and other investigative information with other members of law enforcement regarding the manner in which narcotics traffickers obtain, conceal finance, store, manufacture, transport and distribute controlled substances, as well as conceal, store, transport, and launder narcotics proceeds. I have analyzed records documenting the purchase and sale of controlled substances as well as records pertaining to narcotics-related financial transactions. As a member of the Task Force, I have participated in narcotics-related investigations resulting in state and federal convictions of individuals for narcotics trafficking offenses. I have participated in multiple Title III wiretap investigations.

10. Based upon my experience and training, I am familiar with the manner and means employed by narcotics traffickers, including the manner and means by which narcotics traffickers communicate, as well as the devices and other tools commonly utilized by them, and those methods employed by narcotics traffickers to avoid detection by law enforcement.

11. I know the relative wholesale and retail value of various types of controlled substances, including heroin, cocaine, cocaine base ("crack"), and fentanyl, as well as the way these controlled substances are commonly packaged for wholesale and retail, *i.e.*, "street-level," distribution. I am also familiar with the terminology, slang, and coded terms commonly employed by drug traffickers. I know that narcotics traffickers often use cellular telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by

4

doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets.

12. For example, I know that cocaine is commonly referred to as "coke," and discussed in coded terms such as "soft." I know that those who use powder cocaine often refer to the lines of cocaine as "lines" or "rips." I know, based on my experience, that cocaine is often told in grams and kilograms. In my experience, a gram of cocaine costs between $18 and $30 based on the quantity that is being sold. I know that a kilogram of cocaine typically costs between $15,000 and $22,000 depending on the supplier.

13. Cocaine base ("crack") is referred to as "hard," or by phrases including the word hard ("hard body," for example). Crack is made by converting powder cocaine through a heating process, which drug distributors offer refer to simply as "cooking" or "cooking it up," or, when the process is complete, by referring to the product as having been "done" or "done up." Such "cooking" frequently utilizes microwaves or stovetops. Ounces of crack sell for approximately $900.

14. I know that drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones and sometimes re-activate a cellular telephone that has not been used for a period. I also know that narcotics traffickers sometimes use cellular telephones subscribed in other persons' names and/or addresses, provide fictitious subscriber information, or use pre-paid cellular telephones that require the purchaser to provide little or no identifying information to purchase, activate and utilize, all of which is done to avoid detection and thwart the efforts of law enforcement. Based on my training and experience, I know drug dealers commonly carry two, if not more, phones on themselves to conduct narcotics transactions. Drug dealers commonly carry one phone solely to conduct drug

5

deals and the other phone as a "family" phone, which is used for personal affairs. Drug dealers will also compartmentalize narcotics callers, using separate phones for street-level customers, redistribution customers, and sources of supply or separating phones based on geography region or alias used by the drug dealer.

15. As indicated above, during my tenure as an FBI special agent, I have investigated and participated in numerous operations that involved drug trafficking, firearm, and money laundering violations. Search warrants relating to these investigations have covered vehicles utilized by drug traffickers and their coconspirators, residences of drug traffickers and their coconspirators, premises and residences used by narcotics traffickers as "mills," where drugs are processed and packaged for re-distribution, "stash houses" used as storage locations for controlled substances, locations used as points of distribution for controlled substances, safe deposit boxes, and businesses and offices used by drug dealers as fronts to legitimize their unlawful drug trafficking.

16. Materials searched for and recovered in these locations have included various controlled substances and residue of controlled substances; drug paraphernalia; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs; records reflecting the names, addresses, and telephone numbers of coconspirators; sales receipts, travel records and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; cellular telephones, computers and computer disks; iPads or tablets; and various valuable assets such as property, jewelry, and vehicles that were purchased with the proceeds of unlawful drug trafficking. These items, obtained by search warrants, constituted evidence of drug violations, the acquisitions of

assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

17. Based on my training, experience, and participation in this and other drug trafficking investigations, I also know that:

    a. drug traffickers commonly conceal within their residences, vehicles, or other places under their control controlled substances, diluents, drug paraphernalia, including packaging and processing materials, cash proceeds and items of value derived from drug trafficking, wireless telephones used in furtherance of drug trafficking, firearms, financial records and documents relating to the distribution of controlled substances, including ledgers, and records and documents concerning transactions relating to transferring, storing, secreting, and spending money derived from drug trafficking, including receipts;

    b. drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement;

    c. drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

    d. even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

    e. drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug businesses;

 f. drug traffickers maintain in their residences, vehicles, or other places under their control computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashiers' checks, money orders, telephones with memory capabilities, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

 g. drug traffickers commonly provide narcotics on consignment to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore, the above mentioned books, records, receipts, notes, ledgers, will be secured by the drug traffickers within their residences, vehicles, or other places under their control for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

 h. drug traffickers commonly conceal contraband, proceeds of drug transactions within their residences, vehicles, or other places under their control;

 i. drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

 j. drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashiers' checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

8

k.  persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

l.  drug traffickers often have photographs, slides, or videos of themselves, their co-conspirators and the property, firearms, and assets purchased with drug proceeds. These photographs and videos are normally in the drug trafficker's possession or residence, and are often stored on a cellular telephone or electronic devices such as a computer, laptop, or tablet;

m.  Connecticut is generally viewed as a consumer state in regard to narcotic activity. It is common for drug traffickers to travel to major distribution centers such as New York, Massachusetts, or Florida to purchase their narcotics for distribution. It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers. Drug traffickers' methods include, but are not limited to, the use of shipping companies, such as UPS or FedEx, commercial airlines, private motor vehicles, tractor trailer units, public transportation, motor vehicles with concealed compartments, and government and contract mail carriers. The residences, vehicles, or other areas under control of drug traffickers often contain records of drug related travel or shipping records. These records may include shipping receipts, airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

9

n. drug traffickers commonly have firearms and other weapons in their possession, in their cars, on their person, at their residences, vehicles, or other places under their control including, but not limited to, handguns, rifles, shotguns, automatic weapons, and knives. These firearms and weapons are most often kept to protect and secure drug traffickers' drugs, drug proceeds, and property;

o. it is a common practice for drug traffickers to store their drug proceeds, drug inventory, diluents, and drug related paraphernalia in their residences, vehicles, or other places under their control, including within safes or lock-boxes or other closed containers within their residences, vehicles, or other places under their control, and it is also common for drug trafficker to store these items in the residences or cars of their trusted associates or "stash houses," owned or rented in a name other than their own; and,

p. when controlled substances, including but not limited to heroin, fentanyl, pills, cocaine, and cocaine base, are stored within a premises or an automobile, residue of the controlled substance can remain in the storage location for months after the drugs themselves have been removed, and there exists a process pursuant to which investigators can collect as evidence residue of suspected controlled substances, and the residue can be laboratory tested to confirm, or rule out, the presence of a controlled substance in the residue;

q. drug traffickers often have, possess, maintain and control the items listed in the Attachments to the search warrants sought in this affidavit, in their homes, garages, out-buildings, cars, or other areas under their control.

**IV.   PROBABLE CAUSE**

18.     On November 21, 2024, the Honorable Thomas O. Farrish, United States Magistrate Judge signed a search warrant authorizing investigators to track the location of a telephone which was believed to be utilized by ALEJANDRO-CAPO.

19.     On November 22, 2024, investigators utilized the information from this telephone to locate the device at **Target Location-1**. Law enforcement arrived on scene and located ALEJANDRO-CAPO in the lobby of the hotel. He was placed under arrest. As he was being arrested, an unknown male ran out of the hotel through a side door of the hotel which set off alarms throughout the hotel. ALEJANDRO-CAPO requested that law enforcement go to his hotel room, room 309, to retrieve his medical supplies which he would need to bring with him. Investigators arrived at the room and ensured no other parties were present while they gathered the medical supplies ALEJANDRO-CAPO requested.

20.     While in the room, investigators observed, in plain sight, a cylindrical plastic wrapped item, which appeared to be narcotics, on the table next to the window. The requested medical supplies were gathered, and the room was secured pending the drafting of this document.



## V.  SEALING AND CONCLUSION

21. It is further requested that this affidavit be filed under seal until further order of the Court as the investigation is continuing, and, it is my belief that, based upon the details of the investigation set forth herein, disclosure at this time could compromise the safety of cooperating sources listed herein, law enforcement authorities conducting the investigation and those who will affect the anticipated arrests and searches, and the ongoing investigation itself, by, including but limited to, causing **Subjects** to flee or destroy evidence if they were to be alerted to the contents of this affidavit.

22. Based on the forgoing, I request that the Court issue the proposed arrest warrants, criminal complaints, and search warrants.

Respectfully submitted,

**Corbett Tomsovic** Digitally signed by Corbett Tomsovic
Date: 2024.11.22 12:56:12 -05'00'

CORBETT TOMSOVIC
FBI SPECIAL AGENT

Subscribed and sworn to before me via telephone on November 22, 2024

*Thms O. Farrish* Date: 2024.11.22 13:17:09 -05'00'

HON. THOMAS O. FARRISH
UNITED STATES DISTRICT JUDGE

## ATTACHMENT A

### Property to Be Searched

65 Columbus Blvd, Room 309, New Britain, Connecticut (**Target Location-1**)

**Target Location-1** is a hotel room. The hotel room has the numbers "309" on the left side of the door on the third floor of the building.



This authorization includes the above-described location, all rooms and other parts therein, all safes, lock boxes, or locked containers found therein, and trash containers, and storage areas designated for the use of the specifically described room.

14

## ATTACHMENT B
### *Property to Be Seized*

I. Evidence of violations of 21 U.S.C. §§ 841(a)(1) (Distribution of Narcotics, Possession with Intent to Distribute Narcotics); 846 (Conspiracy to Distribute and Possess with Intent to Distribute Narcotics); and 843(b) (Use of a Communication Facility to Facilitate a Narcotics Trafficking Felony) by **Nelson ALEJANDRO-CAPO** and others, specifically the following:

1. Controlled substances;

2. Firearms, ammunition, and firearm accessories;

3. Records and information constituting or concerning correspondence among between individuals that relate in any way to purchasing, acquiring, selling, shipping, or transferring controlled substances;

4. Records and information containing photographs and/ or videos depicting firearms or controlled substances;

5. Any controlled substance (all of which could be in any form) and items containing residue of controlled substances;

6. Paraphernalia used and commonly associated with the possession and distribution of controlled substances, including, but not limited to: scales, packaging materials, including plastic baggies, plastic or glass vials, heat sealing machines, pipes, grinders, funnels, presses, sifting screens and/or strainers, and any materials used for "cutting" or diluting controlled substances;

7. Any books, records, receipts, notes, ledgers, journals, travel documents and other papers relating to the purchase and distribution of controlled substances;

8. Bank statements, tax records, financial statements and records, safe deposit keys, storage unit keys, receipts, and other books and records, including any related to the purchase of real property and personal property (including automobiles, boats, jet-skis, snowmobiles, motorcycles and all-terrain vehicles), and, in general, any records or documents evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances.

9. United States currency, stocks, bonds, certificates of deposit, any other financial instruments, money counters, and the contents of any safes or other security type boxes or locked boxes and containers, including any jewelry, precious metals and gems, such as gold, silver and diamonds evidencing the obtaining, transfer, concealment, or expenditure

of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances;

10. Photographs of people, assets, or objects that may be related to the purchase and distribution of controlled substances;

11. Personal effects tending to establish proprietary interest, including but not limited to, personal identification, driver's licenses, vehicle registration certificates, passports, birth certificates and deeds;

12. Records of travel in furtherance of the unlawful distribution of drugs;

13. Records, information, and items regarding (i) dominion and control over **Target Location-1**, (ii) the identity or known aliases of **ALEJANDRO-CAPO**, or (iii) the existence or location of any storage areas or containers where evidence of violations of the Target Offenses may be found. Such records, information, and items would include personal identification documents, keys **to Target Location-1** or storage areas, documents and papers bearing names and addresses, rental receipts, lease agreements, mortgage records, utility bills, canceled mail, paycheck stubs or other employment records.